## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 26 B 00460 |
| | ) | |
| CEZARY J. SKIBA, | ) | Chapter 13 |
| | ) | |
| Debtor. | ) | Honorable Daniel R. Fine |

**MEMORANDUM OPINION**

Cezary J. Skiba filed a chapter 13 bankruptcy petition in January 2026. The next month, he filed a motion for turnover. (Dkt. No. 25.) The motion seeks to restore Skiba to possession of a condominium unit (the "condo") that a state court previously placed under the control of mortgagee-creditor FP-Jeff Park LLC ("Jeff Park"). Skiba's motion will be granted. Jeff Park's separate motion for stay relief (Dkt. No. 28) will be denied.

Here is the capsule summary. The Bankruptcy Code enacts a presumption in favor of turnover. Jeff Park has not overcome that presumption. Among other shortcomings, Jeff Park generally sidesteps the governing legal framework and presses arguments the Supreme Court nixed more than 40 years ago. Nothing about Jeff Park's stay relief motion upsets the analytical applecart. Its half-hearted, inscrutable prosecution of its motion all but forfeited the issue of stay relief. In all events, Jeff Park's interest in the condo appears to be protected by a sizeable equity cushion. The unrebutted evidence is that Skiba, who works as a real estate broker, wishes to sell the condo to pay off creditors.

The upshot of all this: the condo will be returned to Skiba so he can do just that.

## I.  Jurisdiction

"Federal courts are courts of limited jurisdiction and may only exercise jurisdiction where it is specifically authorized by federal statute." *Teamsters Nat'l Auto. Transporters Indus. Negotiating Comm. v. Troha*, 328 F.3d 325, 327 (7th Cir. 2003). Bankruptcy courts are (sometimes) subject to additional, constitutional constraints on their ability to adjudicate issues — even when a statute confers jurisdiction. *E.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669–71, 674–78 (2015) (bankruptcy judges can adjudicate certain types of claims only with the parties' consent).

The Court has jurisdiction here under 28 U.S.C. §§ 1334(b) and 157(b)(1). Motions seeking turnover of estate property and for stay relief are "core" proceedings congress empowered bankruptcy judges to decide. 28 U.S.C. § 157(b)(2)(E), (G). The motions do not implicate constitutional limits on bankruptcy-court authority, and so additional consent from the parties is unnecessary. *See In re Robinson*, 577 B.R. 294, 297 (Bankr. N.D. Ill. 2017); *Soshkin v. Brizinova (In re Brizinova)*, 554 B.R. 64, 68 (Bankr. S.D.N.Y. 2016).

## II.  Background

In June 2017, Skiba and his now-ex-wife purchased the condo, whose proper address is 3335 W. Belle Plaine, Unit 3A, Chicago, Illinois. (Debtor Ex. No. 3.) They paid $155,000 in cash. *Id.* Skiba later took out a line of credit, secured by a mortgage on the

condo, with Signature Bank. *Id.* The mortgage was assigned to Jeff Park in April 2025. (Stip. No. 4.)[1]

After Skiba defaulted on the line of credit, Jeff Park sought relief in the state court. In October 2025, the Chancery Division of the Circuit Court of Cook County issued an order that placed Jeff Park in possession of the condo. (Stip. No. 5.) The October 29, 2025 order (the "October 29 Order") was entitled "Order Placing Mortgagee in Possession." (Dkt. No. 28 Ex. A.) It required Skiba to surrender keys to the condo and cooperate with Jeff Park's stewardship. (*Id.*)

The October 29 Order vested in Jeff Park "all the duties, responsibilities[,] and powers enumerated in the Illinois Mortgage Foreclosure Law (735 ILCS 5/15-1101 *et seq.*)." (*Id.*) Jeff Park was authorized to appoint a receiver and collect all rents from the condo and was entitled to charge a "reasonable fee"—up to $1,000 per month—for its work "in carrying out the management of the property." (*Id.*) That fee could be added to the amount due under the mortgage. (*Id.*)

Exactly what happened between the October 29 Order and this bankruptcy filing is at once hazy and not all that important. (What is clear is that no rent was ever collected because the condo was not being rented out.) In January 2026, Skiba filed a bankruptcy petition. The next month, Skiba's attorneys demanded that Jeff Park turn over the condo. (Debtor Ex. No. 2.) Jeff Park's counsel demurred: "I believe this issue is better determined

---

[1] Citations in the form "Stip. No. _" refer to the stipulations that the parties filed in their Joint Pretrial Statement. (*See* Dkt. No. 58 at 3–6.)

by the judge and we will promptly abide by the Court's ruling." (Debtor Ex. No. 5.)

Motion practice ensued.

Skiba filed his motion for turnover. (Dkt. No. 25.) Jeff Park filed its motion for stay

relief, which also responded to the turnover motion. (Dkt. No. 28.) Both parties filed

additional briefs (Dkt. Nos. 44, 45, & 47), and the Court set both motions for an

evidentiary hearing, which was held on April 27, 2026. (Dkt. No. 57.) A transcript of the

hearing ("HT") has been placed on the docket. (Dkt. No. 90.)

At the hearing, the Court received testimony from Skiba. Other witnesses were

listed. None was called, and Jeff Park's attorney could not locate Charles Kipp, the

receiver that Jeff Park had appointed to oversee the condo. (HT 4.) Both parties had listed

Kipp as a witness. (Dkt. No. 58 at 8.) The Court admitted Debtor Exhibit Nos. 1–9 and 12–

15 into evidence. (HT 15.) Exhibits from Jeff Park were neither offered nor admitted.[2]

### III. Legal Standards

The moment a bankruptcy petition is filed, an "estate springs into existence"

under Section 541(a) of the Bankruptcy Code. *See In re Airadigm Commc'ns, Inc.*, 616 F.3d

642, 648 (7th Cir. 2010). The estate consists of several categories of property "wherever

located and by whomever held" — including "all legal or equitable interests of the debtor

in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); *see also Harrington*

---

[2] Jeff Park did not timely provide the Court with copies of its exhibits, and so its exhibits were not admitted en bloc. The Court still permitted Jeff Park to move any exhibits into evidence at the hearing. (HT 16–17.) It did not attempt to do so.

*v. Purdue Pharma L.P.*, 603 U.S. 204, 214 (2024) ("When a debtor files for bankruptcy, it 'creates an estate' that includes virtually all the debtor's assets.").

At the same instant Section 541(a) creates an estate, the Code's automatic stay provision, Section 362(a), broadly puts on hold most efforts to dismantle it. The automatic stay pauses a variety of activities, including efforts to exercise control over estate property after bankruptcy is filed. 11 U.S.C. § 362(a)(1)–(8). Frequently described as a "fundamental" protection afforded to debtors in bankruptcy, *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986), the automatic stay "preserves what remains of the debtor's insolvent estate and . . . prevent[s] a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts," *In re Grede Foundries, Inc.*, 651 F.3d 786, 790 (7th Cir. 2011).

The Bankruptcy Code's sections on turnover (11 U.S.C. §§ 542 and 543) work hand in glove with Sections 541 and 362, enabling estate assets to be gathered for centralized administration. *Cf. City of Chi. v. Fulton*, 592 U.S. 154, 165 (2021) (Sotomayor, J., concurring) (turnover can allow a debtor to use an asset in a way that benefits creditors while protecting a secured creditor's interest).

The specific turnover section on which Skiba relies is 11 U.S.C. § 543. That section governs property within the control of a "custodian" at the time a debtor files bankruptcy. A custodian includes any "receiver or trustee of any property of the debtor" who was "appointed in a case or proceeding" outside of bankruptcy. 11 U.S.C. § 101(11)(A). Section 543 generally requires a custodian to "deliver to the trustee" any estate property

as soon as the custodian "acquires knowledge of the commencement of the case[.]" 11 U.S.C. § 543(b)(1).

In a chapter 13 bankruptcy, the "trustee" to whom property is turned over is the debtor himself. This is because 11 U.S.C. § 1303 gives a chapter 13 debtor the rights and powers of a trustee under 11 U.S.C. § 363(b). The latter provision gives the trustee authority to "use, sell, or lease" property of the estate. A debtor is therefore the "'proper party to seek turnover . . . because the property that the debtor seeks to have turned over is property that he as debtor may use in the ordinary course of business.'" *In re Coleman*, 229 B.R. 428, 430 (Bankr. N.D. Ill. 1999) (quoting *Gen. Motors Acceptance Corp. v. Radden (In re Radden)*, 35 B.R. 821, 826 (Bankr. E.D. Va. 1983)); *see also In re Cordova*, 635 B.R. 321, 339 (Bankr. N.D. Ill. 2021) ("[A] trustee's duties in chapter 13 are mainly administrative and in the role of safeguarding the process. It is the debtor who is responsible for administering the bankruptcy estate.").

Under the Bankruptcy Code, turnover is the default rule. Turnover is favored because blocking access to estate assets during the stay-created "breathing spell" would make it more difficult to reorganize. *See* 5 COLLIER ON BANKRUPTCY ¶ 543.05 (16th online ed. 2026) (citation omitted); *see also In re Novus Structures, Inc.*, 653 B.R. 429, 438–39 (Bankr. N.D. Ill. 2023) (quoting the Collier treatise); *In re 4522 Kateuua Ave., EEC,* No. 15-12107, 2016 WL 93722, *2 (Bankr. D. Kan. Jan. 6, 2016) (turnover is the rule and retention is the exception); *In re Cash Currency Exch., Inc.*, 762 F.2d 542, 553 (7th Cir. 1985) (explaining in dicta that "a third party may have taken possession, custody, or control of the debtor's

assets prior to the filing of a bankruptcy petition. If such party is a custodian within the meaning of 11 U.S.C. § 101[11], it must turn over the property of the debtor to the bankruptcy trustee").

Turnover may be the presumption, but it is not a certainty. Courts may excuse turnover under Section 543 "if the interests of creditors . . . would be better served by permitting a custodian to continue in possession, custody, or control of such property[.]" 11 U.S.C. § 543(d)(1). In deciding whether to excuse turnover, courts have "significant latitude." *Novus Structures*, 653 B.R. at 437.

### IV. Discussion

There is no dispute that the prerequisites for turnover are present here. Jeff Park has not shown that turnover should be excused, and it has not shown that stay relief is appropriate. As a result, Skiba's request for turnover will be granted, and Jeff Park's request for stay relief will be denied.

### A.   The Motion for Turnover Is Granted.

*1.   Jeff Park Concedes the Basic Prerequisites for Turnover*

A debtor seeking turnover has the burden of showing that a custodian has possession, custody, or control of estate property. *In re Willows of Coventry, Ltd. P'ship*, 154 B.R. 959, 960 (Bankr. N.D. Ind. 1993). Once that showing has been made, the party resisting turnover must show that turnover should be excused. *E.g., Novus Structures*, 653 B.R. at 444; *In re Franklin*, 476 B.R. 545, 551 (Bankr. N.D. Ill. 2012).

To its credit, Jeff Park concedes that the turnover prerequisites exist here. At the start of the April 27 evidentiary hearing, Jeff Park acknowledged that it was the custodian

of the condo under the October 29 Order and that the condo is Skiba's property. (HT 19–20; Stip. No. 3.) Jeff Park changed the locks to the condo and currently possesses it. (Stip. No. 7.) *See also In re Attack Props., LLC*, 478 B.R. 337, 345 (N.D. Ill. 2012) ("A receiver appointed by a state court is a custodian subject to § 543(b)(1).").

Because Jeff Park conceded that the conditions generally requiring turnover are present here, Skiba met his burden before the Court received evidence.

### 2.   *Jeff Park Did Not Show That Excusing Turnover Would Better Serve Creditors*

The plain language of Section 543(d)(1) sets out the test for excusing turnover. The Court may excuse turnover "if the interests of creditors . . . would be better served by permitting a custodian to continue in possession, custody, or control of such property[.]" 11 U.S.C. § 543(d)(1).

To analyze whether the interests of creditors would be "better served" by excusing turnover under Section 543(d), courts have examined several factors. Those factors aid but do not dictate the analysis. *Novus Structures*, 653 B.R. at 441. This is because the lodestar of statutory interpretation is congressional intent, which is generally revealed by examining a statute's plain language, properly placed within the context of a statutory scheme. *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1077 (7th Cir. 2013). Judge-made factors are useful only if they help expose the meaning of the words that congress enacted.

In the turnover context, judge-made factors include: (1) the likelihood of reorganization; (2) the probability that funds required for reorganization will be available; (3) instances of mismanagement by the debtor; (4) whether creditors would be injured from turnover; (5) whether turned over property will be used for the benefit of

creditors; (6) whether there are avoidance issues with respect to property retained by a receiver (because a receiver does not possess avoiding powers for the benefit of the estate); and (7) the fact that the bankruptcy automatic stay has deactivated a state-court receivership action. *Novus Structures*, 653 B.R. at 441 (quoting *In re Falconridge, LLC*, No. 07-bk-19200, 2007 WL 3332769, *7 (Bankr. N.D. Ill. Nov. 8, 2007)).

To the limited extent Jeff Park addresses these factors, it has focused on the issue of mismanagement. (Dkt. No. 28 at 5.) Mismanagement militating against turnover must, in the Court's view, refer to mismanagement of property that either was in fact "injurious to creditors," *In re Poplar Springs Apartments of Atl., Ltd.*, 103 B.R. 146, 150 (Bankr. S.D. Ohio 1989), or which as a predictive matter indicates that property would be better off in the hands of an existing custodian. That is, mismanagement is a backward-looking factor that is used to make a forward-looking assessment of the creditors' interests.

Several of the management shortcomings identified by Jeff Park are not about management of the condo but about whether Skiba's lawyers have filed an adequate chapter 13 plan. (Dkt. No. 28 at 5.) Jeff Park's plan critiques have nothing to do with management of the condo. To the extent Jeff Park suggests that there is a low likelihood of reorganization merely because the initial plan Skiba filed may not be ready for primetime and has drawn a trustee objection (*cf. id.*), it has not cogently explained how the alleged shortcomings translate to a low likelihood of reorganization.

The other proposed indicia of mismanagement Jeff Park highlights: Skiba's having failed to repay the loan to Jeff Park, pay property taxes, and provide proof of insurance. (*Id.*) These indicia are not compelling, particularly on the record before the Court.

Without more, failing to pay property taxes or not living up to loan-based financial commitments in the run-up to bankruptcy says little about whether excusing turnover would benefit creditors. *Novus Structures*, 653 B.R. at 443 ("Failure to pay property taxes . . . [does] not . . . rise[] to the level of mismanagement that would support departing from the statutory [turnover] presumption."); *In re R & G Props., Inc.*, No. 08-10876, 2008 WL 4966774, *10 (Bankr. D. Vt. Nov. 21, 2008) ("If every debtor in default was deemed to have mismanaged its business for purposes of § 543(d)(1), it would be virtually impossible for any debtor to regain control of its property. . . ."). Failing to make sure the condo was insured could imperil creditors, but Jeff Park's vague assertions on this score amount to nothing more than attorney say-so. *See Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 853 (7th Cir. 2002) ("[I]t is universally known that statements of attorneys are not evidence."); *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record.").

Far from mismanaging the condo, the record indicates that Skiba improved it. (HT 42–43, 73.) Before the October 29 Order, Skiba was readying the condo for sale and was doing work that included painting and caulking; before that, Skiba had remodeled the bathroom, which included re-tiling and installing new fixtures, vanities, and a shower.

(*Id.*) Jeff Park neither argued nor presented evidence tending to suggest that Skiba allowed the property to fall into disrepair or took other steps harmful to creditors.

Nor are creditors imperiled by Jeff Park's concern that Skiba intends to "change the locks and bar anyone else from access to the [condo]." (Dkt. No. 28 at 6.) Creditors do not typically have unfettered rights of access to residential property, even if encumbered by a mortgage. Jeff Park does not point to any contractual right that gives it or any creditor such rights here. And background rules of property ownership generally have it that a possessory interest in property includes the right to exclude others. *See* RESTATEMENT (FIRST) OF PROPERTY § 7 (A.L.I. 1936).

The idea that giving Skiba a possessory interest in property *all the way* would somehow harm creditors, or that the Bankruptcy Code should be used as a tool to upset well entrenched property rights, is difficult to swallow: "The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). In contrast, Jeff Park is merely a creditor who has no underlying right to the condo. "Its only entitlement is to the adequate protection of its interest." *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992) (explaining that "[a] security interest is—a security interest" and "not a fee simple").

Jeff Park fails meaningfully to address the other factors courts consider when evaluating turnover motions. It also fails to acknowledge that, since the October 29 Order

was issued, Jeff Park appears to have done nothing with the condo—beneficial to creditors or otherwise—apart from changing the locks.

Jeff Park had the burden on these matters; its failure to prove its case is fatal. If Jeff Park had intended for its appointed receiver, Jeff Park principal Charles Kipp, to appear at the evidentiary hearing and offer evidence, his failure to show up on April 27 was a self-inflicted injury. Kipp had been listed by both parties as a witness. Failing to appear at a hearing where Jeff Park had to show that Kipp's steady hand would make creditors better off was, if nothing else, unhelpful to Jeff Park.

For Skiba's part, he testified that he intends to market and sell the condo so that he can fund a chapter 13 plan and pay off his creditors. (HT 61, 64, 83.) Skiba is a real estate broker with more than 20 years of experience, and he would be able to market and sell the property on his own. (HT 68–69, 80; Debtor Ex. No. 3.) Although Skiba's ex-wife may or may not remain on the deed for the condo following their divorce (HT 26, 60), the unrebutted testimony at the hearing is that she is "very much on board" with the plan to sell the condo. (HT 64.) Were she not on board, Bankruptcy Code Sections 1303 and 363 could empower Skiba to sell the condo free and clear of any interest held by his ex-wife. *See Pettie v. Brannon (In re Brannon)*, 584 B.R. 417, 424–25 (Bankr. N.D. Ga. 2018).

There is little reason to suppose that any creditor (perhaps even Jeff Park) would be better off with the condo in Jeff Park's hands. Jeff Park has stated that it wishes for turnover to be excused (and stay relief granted) so that it can return to state court and obtain permission to foreclose on the condo. But Jeff Park has been unable to serve

process on Skiba's ex-wife in the state-court matter. (Dkt. No. 28 at 9.) And it is hardly obvious how Jeff Park could expect a foreclosure sale of the condo to produce greater value than a traditional sale on the open market. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 539 (1994) ("[P]roperty that *must* be sold within . . . [the] strictures [of a foreclosure sale] is simply *worth less.* No one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques.").

In sum, Jeff Park has not shown that excusing turnover would better serve Skiba's creditors.

3. *Certain Jeff Park Arguments Misadvise the Court and Sidestep the Law*

Jeff Park's papers make several broad, citation-free, and incorrect statements to the Court about the governing legal standards. For instance, Jeff Park advises the Court that "[t]urnover under § 543 applies only to property the debtor had a right to possess at filing." (Dkt. No. 28 at 4.) And thus, "[c]ourts hold that a bankruptcy does not restore possession [that was] lost pre-petition through lawful state court process." (*Id.*) Not so.

More than four decades ago, the Supreme Court held that property of which a debtor had been lawfully dispossessed was still estate property subject to turnover. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205–06 (1983). The Court explained in that decision that several provisions of the Bankruptcy Code "bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced." *Id.* at 205. One provision the Supreme Court identified is the one Skiba invokes in his turnover motion: Section 543 of the Code. *Id.* at

n.10. The Supreme Court's decision in *Whiting Pools* is impossible to square with Jeff Park's representations to the Court.

Supreme Court decisions do not have expiration dates, and it would (emphatically) not be a lower court's job to clear the shelf even if they did. *E.g., State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). What is more, courts in fact hold the opposite of what Jeff Park says: if one "were to accept . . . [the] argument that the appointment of a receiver terminates the Debtor's ownership of the property, Section 543 would serve no purpose, as the receiver would never hold any property of the debtor." *In re Koula Enters., Ltd.*, 197 B.R. 753, 758 (Bankr. E.D.N.Y. 1996); *see also In re Hall*, 502 B.R. 650, 667 (Bankr. D.C. 2014) (citing *Whiting Pools* and explaining that the Code "grants a right of possession to the trustee subject to the procedural protections that the creditor enjoys" under the turnover and stay-relief provisions); *In re Sheridan*, No. 10-10321, 2010 WL 3222407, *3–4 (Bankr. D. Vt. Aug. 16, 2010) (discussing *Whiting Pools* and explaining that property that was seized but not sold pre-petition remains estate property and subject to turnover).

A related for-instance of misadvising the Court is Jeff Park's statement that "turnover pursuant to § 543 is primarily meant to allow a debtor to *maintain* his residence." (Dkt. No. 28 at 5 (emphasis in original).) Again, Jeff Park does not provide the Court with authority for this pronouncement.

Whether the condo was being used as Skiba's residence, lay vacant, or had been put to some other use would not necessarily leave creditors better or worse off. Section 543 and its subsections are agnostic about whether property is commercial or residential,

inhabited or not. *Cf. also, e.g., Hernandez v. Park Fed. Nat'l Savs. Bank (In re Hernandez)*, Bankr. No. 15-bk-13715, 2016 WL 1055061 (Bankr. N.D. Ill. Mar. 18, 2016) (ordering turnover of vacant, residential property).[3]

Similarly unavailing are Jeff Park's arguments that ordering turnover would "overturn" or "invalidate" the October 29 Order that put Jeff Park in possession and that turnover would otherwise interfere with a state-court foreclosure proceeding. (*See* Dkt. No. 45 at 1; Dkt. No. 58 at 6–7.) These arguments do not affirmatively misstate the law, but they do fail to appreciate the interplay between bankruptcy law (which is federal) and state-court receiverships.

It is well established that "[b]ankruptcy courts have exclusive jurisdiction over a debtor's property, wherever located, and over the estate." *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004). Exercising that jurisdiction does not "overturn" or "invalidate" the October 29 Order. The Bankruptcy Code itself is what halted the state-court receivership action and created a presumption that Skiba is entitled to the possessory interest he seeks to obtain. *See* 11 U.S.C. §§ 362(a)(3), 543(b); *Hall*, 502 B.R. at 668. It is a commonplace that "under federal bankruptcy law, there may be federal

---

[3] Jeff Park attempted to explore at the hearing whether Skiba provided factually misleading information during the Section 341 meeting of creditors. The issue was not properly teed up for consideration. Jeff Park did not use the Joint Pretrial Statement to identify Skiba's alleged dishonesty as a theoretical (Dkt. No. 58 at 3) or factual (*id.* at 6–7) basis for excusing turnover. *See Olsen v. Am. S.S. Co.*, 176 F.3d 891, 897 (6th Cir. 1999) (party not entitled to pursue claim omitted from pretrial statement); *Hiner v. Koukhtiev (In re Koukhtiev)*, 576 B.R. 107, 135 (Bankr. S.D. Tex. 2017) (same). Jeff Park did not provide the Court with a transcript of the Section 341 meeting in any event. (*See* HT 36.)

statutes or 'federal interest[s]' that 'require[ ]' an application of federal law where state law might otherwise govern." *In re Container Store Grp., Inc.*, 676 B.R. 356, 374 (S.D. Tex. 2026) (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)).

The October 29 Order—like orders from courts everywhere—exists within the constitutional order. Some matters fall within this Court's purview and others outside it. *E.g., Stern v. Marshall*, 564 U.S. 462, 487 (2011). Ordering turnover simply falls in the former category. Now that Skiba filed a bankruptcy petition, this Court is the proper forum for determining whether the condo (which is property of the bankruptcy estate) should remain with Jeff Park or be returned to Skiba.

**B.** **Jeff Park's Stay Relief Motion Is Denied.**

In response to Skiba's motion for turnover, Jeff Park sought stay relief. (Dkt. No. 28.) Jeff Park's motion will be denied.

The Bankruptcy Code provides that, at a hearing on a stay-relief motion, the party requesting relief "has the burden of proof on the issue of the debtor's equity in property[,]" and the party opposing relief "has the burden of proof on all other issues." 11 U.S.C. § 362(g)(1)–(2). Before any burden shifts, a movant must kick things off by showing that it has "brought a facially plausible motion" establishing "prima facie" entitlement to relief. *In re Smith*, 675 B.R. 878, 886 (Bankr. N.D. Ill. 2025). Jeff Park has not done so here.

Jeff Park's pursuit of stay relief was languid at best. It is not the Court's job to put Jeff Park's best foot forward: "Federal courts are not roving commissions, licensed to sally forth each day looking for wrongs to right." *Margolin v. Nat'l Ass'n of Immigration Judges*,

146 S.Ct. 1285, 1288-89 (2026) (cleaned up). Courts are "essentially passive instruments of government," *id.* at 1288 (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020)), and so parties must "make their cases by squarely presenting issues to trial courts and by citing legal authorities that situate a case within the case law on a given topic[,]" *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, No. 04-cv-346, 2010 WL 1325732, *1 (N.D. Ill. Mar. 30, 2010).

Outside of its closing argument, Jeff Park said not a word at the evidentiary hearing about stay relief. It elicited no testimony. Before the hearing, Jeff Park's briefing was cursory. In its papers, Jeff Park maintained that it is entitled to stay relief under 11 U.S.C. § 362(d)(1) and (d)(2). Little was said by Jeff Park about these arguments, however, and so the Court will say only a little more about them here.

Jeff Park has not made out a prima facie case for stay relief under Section 362(d)(1). That provision requires bankruptcy courts to grant stay relief for cause, including if a party in interest lacks "adequate protection of an interest" in property targeted by a stay-relief motion. 11 U.S.C. § 362(d)(1). Jeff Park suggests that its interest in the condo is not adequately protected (Dkt. No. 28 at 7–8) but does little more than incant that the adequate-protection analysis "is not an exact science" (*id.* at 7 (quoting *In re Conway*, 648 B.R. 318, 321 (Bankr. N.D. Ill. 2023)).

Adequate protection may not be an exact science, but there are some guideposts. One of them is that when there is a large "equity cushion" in a property—meaning that "the value of the collateral available to the creditor exceeds by a comfortable margin the

amount of the creditor's claim," 3 COLLIER ON BANKRUPTCY ¶ 362.07[3][d][i] (16th online ed. 2026) — then the lender likely has adequate protection. *See In re W. Nottingham Academy in Cecil Cnty.*, 662 B.R. 103, 116 n.31 (Bankr. D. Md. 2024) (synthesizing case law). Stay relief on adequate-protection grounds is thus less likely to be necessary. *E.g., In re Moche*, 677 B.R. 592, 613–14 (Bankr. S.D.N.Y. 2026) (adequate protection not warranted where a property's value "exceeds the Bank's claim by a wide margin"). The basic idea is that, the larger the equity cushion, the more likely it is that liquidation could go poorly while creditors still get paid.

Here, Jeff Park's amended proof of claim seeks $175,199.61. (*See* Claim 2(A) at 4.) Jeff Park itself pegs the value of the condo at $238,000.00. (*Id.*) Assuming the accuracy of Jeff Park's numbers, there appears to be a sizeable equity cushion (about 26%) that protects its interest in the condo.[4] Jeff Park has not attempted to explain why the equity cushion does not protect its interest. Although adequate protection is determined on a case-by-case basis, the "[c]ase law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection." *In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987); *see also In re Clouter Creek Rsrv. LLC*, 669 B.R. 764, 785 (Bankr. D.S.C. 2025) (20-percent cushion almost always sufficient); *In re Big Dog II, LLC*, 602 B.R. 64, 70 (Bankr. N.D. Fla. 2019) (same).

---

[4] Accounting for roughly $4,600 in allegedly outstanding tax obligations (*see* Dkt. No. 45 at 4–5) would subtract about 2% from the cushion, and transaction costs from selling the condo would of course shave off a little more.

Similarly, Jeff Park has not made out a prima facie case for stay relief under Section 362(d)(2). That provision calls for relief from the stay as to a property if the debtor lacks equity, and the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). The record evidence is that Skiba has significant equity in the condo and that the condo is the centerpiece of Skiba's reorganization efforts. Jeff Park's position that Skiba's initial chapter 13 plan has flaws and has drawn an objection from the chapter 13 trustee (Dkt. No. 28 at 8) neither negates Skiba's equity nor demonstrates that the condo is unnecessary to an effective reorganization.

Simply put, Jeff Park's stay relief motion never really gets moving. The automatic stay will remain in place. The condo will be turned over to Skiba. He will get the chance to administer the asset in his chapter 13 bankruptcy case.

### V.  Conclusion

The Court will separately enter on the docket orders that grant Skiba's motion for turnover (Dkt. No. 25) and deny Jeff Park's motion for stay relief (Dkt. No. 28).

**ENTERED:**

**DATE: June 18, 2026**

**Daniel R. Fine**
**United States Bankruptcy Judge**